Macdonald, D. Lloyd, J.
Before the Court is the complaint of the plaintiff trustees of the One Chestnut Condominium Trust (the “Condominium” or “One Chestnut”) seeking equitable and statutory relief pursuant to G.L.c. 183A. The case was brought against the defendant unit owner for failing to provide access to the trustees’ contractors for purposes of inspecting and remediating an allegedly dangerous condition arising from the circumstance that the defendant’s fireplace shares a common flue with that of the furnace that heats all units in the Condominium. The interior wall of the chimney flue had substantially deteriorated, and the trustees’ response to that condition precipitated the conflict underlying the present action.
The case was tried to the Court over a period of nine days, and 87 exhibits were entered. The Court took a view of the premises at the outset of the trial.
Findings of Fact
The Condominium is located at One Chestnut Street on the south slope of the Beacon Hill section of Boston. It is a five-story brick building constructed in the early 1800s at the corner of Walnut Street. It is comprised of eleven residential units. The original master deed and the declaration of trust were executed and recorded in 1972. Exhibits 1 and 2. The building is divided into an “A” side and a “B” side, with (as one faces the structure from Chestnut Street) the A side on the right and the B side on the left. The A side abuts Walnut Street.
The defendant Mina Harrington (the “Defendant” or “Harrington”) purchased Unit 1A in 1973 from the developers of the property. Exhibit 50 (copy of deed). The unit is comprised of a single bedroom, living room, library, kitchen and bathroom. Exhibit 80. There are two fireplaces in the unit, one in the bedroom and one in the living room, but the living room fireplace is the only one that has functioned while the Defendant has owned the unit. The living room fireplace will be referred to as the “Fireplace.”
*531 Harrington is married to Curt Deininger (“Deininger”) and was at the time that she purchased the apartment. Over the years, Harrington essentially ceded to Deininger responsibility for the dealing with the Condominium and its trustees. She did not attend any meetings of the unit owners. At trial, Deininger accepted as accurate the trustees’ counsel’s characterization that “Eveiything was you” as far as his wife’s relationship with the administration of the Condominium was concerned.
Harrington is an antiquarian bookseller and (by self-description) a “housewife.” Deininger, although he studied physics at MIT for several years, made his career as an art dealer, art appraiser and decorator, specializing in 18th-century furniture and paintings. Their apartment is decorated with such period pieces, and it was evident to the Court that both Harrington and Deininger cared deeply about such pieces and the distinctive character of the apartment to which the pieces contributed.
As noted, the Fireplace at issue is located in the living room. It is visible immediately upon entrance into the apartment and forms the decorative centerpiece of the room. Exhibit 57A. The Fireplace is coal, not wood, burning. It is shallow in depth (8 1/2") and narrow (19" across the front). Exhibit 59.
Deininger described the Fireplace and the living room as “the soulful representation to us of an 18th centuiy room.” Harrington credibly testified that she would not have bought the apartment if the Fireplace had not been working.
Deininger’s and Harrington’s use of the Fireplace, however, was episodic. According to Harrington, on their first night in the apartment, she and Deininger lit a fire. Thereafter in the late 70s, the fireplace was also used, but they suspended use when (by Deininger’s testimony) “life overwhelmed [them].” However, during the “Reagan years,” according to him, “life was slower,” and they resumed use of the Fireplace. In the 1990s, with signs of the interior of the chimney deteriorating (a process described by Deinin-ger as “spalling”—plaster lining and pieces of brick coming loose), the Fireplace flue was blocked with cardboard and not used again until the events leading to the case at hand. At all times, lighting a fire was not easy (Deininger testified that it was a “bugger” to get lit), and the burning coal emitted residual dust.
On the A side of One Chestnut, there are two chimneys. Exhibits 55A-C. The chimney servicing the Fireplace is located in the building’s southeast comer adjacent to the Walnut Street/Chestnut Street intersection. The flues in the chimneys are constructed of brick and mortar and are lined with clay tiles. In the summer of 2006, the trustees were informed that several A side units were experiencing leaks, and it was suspected that the condition of the chimneys was at least partly responsible. Deininger, who for approximately twenty years had overseen the routine maintenance of the Condominium and functioned as its manager, volunteered to examine the situation.[1] The trustees also asked a roofing and chimney contractor, Boston’s Best Chimney (“Boston’s Best”) to advise.
Deininger found “serious problems” with the southeast chimney and prepared two reports for the trustees. Exhibits 3 and 4. He wrote that the chimney “carries the burner’s [i.e., the furnace’s] sulphurous gases to the atmosphere. Over the years the flue’s membrane has been eroded by water and temperature contractions (so much so that approximately 10-15 gallons of debris are removed twice a year during chimney clean out.” Exhibit 4. He recommended that the “flue needs a liner as far down as one can be snaked (preferably, stainless steel) to protect the brick of the chimney from spalling.” Exhibit 3.
When the chimney contractor, Boston’s Best, examined the chimney in 2006, it advised the building manager, Brooks Porter (“Porter”) of Street & Company, that there was, indeed, evidence of serious deterioration. He also reported that the Condominium’s furnace, which was located in the basement immediately under Harrington’s apartment, vented into the same flue as Harrington’s Fireplace. Such dual venting was a direct violation of the Massachusetts state building code. In an email to his fellow trustees, the chair, Michael Lampert (“Lampert”) described the dual venting situation as “a big no-no.” Exhibit 48. Boston’s Best also warned the trustees that accumulating debris at the base of the flue risked an explosive fire.
It is the events which ensued in response to the trustees being informed of this code violation and the risks posed by the state of the chimney that gave rise to the dispute leading to the present lawsuit. The trustees were advised that to fix the chimney properly, they ought to line the entire flue with sheet metal to the juncture of the furnace exit pipe. The problem with this solution, however, was that by the trustees so lining the flue, the Harrington Fireplace’s venting access to the flue would be cut off and the Fireplace would be rendered inoperable.
After receiving Deininger’s and Boston’s Best’s reports, the trustees in 2006, hired GMA Architects & Engineers, P.C. (“GMA”) to advise them further. GMA, in turn, engaged the consulting firm, SED Associates Coip. (“SED”) to evaluate the chimney situation. In early January 2007, the trustees were given SED’s report. Exhibit 5. The report concluded: “[W]e concur with [Boston’s Best’s] observation that the existing chimney is in need of major repair and lining.” SED continued:
The existing chimney can only be used to vent the fireplaces that are currently attached to the boiler... This new vent will need to be run through the roof to the exterior of the building ... If it is not possible to run a new boiler vent up through the residences above it could be accomplished by sealing the fireplaces off to the chimney making them ornamental in nature, and using the chimney to vent the boiler. The chimney would need to be lined as required by code as noted by the contractor [Boston’s Best].

*532
Id.

In transmitting the SED report to his fellow trustees on January 9th, trustee Archie Sanchez noted in his email that “[t]he evaluation seems to be quite thorough and distressing.” Exhibit 70. Lampert (chair of the trustees) responded, “My sense is that we need clarification of our alternatives.” Id. Lampert noted that a further inspection was needed of the intersection of the furnace vent and the Harrington Fireplace vent into the common flue.
Early on, it became a problem for Porter and the contractors he engaged for the Condominium to secure access to Harrington’s apartment. Deininger insisted on lengthy notice, and on several occasions, despite timely notice, access was denied by Deininger because of some intervening circumstance.
Deininger and Harrington were concerned in good faith about the risk of damage to their valuable furnishings and paintings on account of the contractors’ presence and work to be done in and around the fireplace. To protect the decorative interior of the living room during such inspections, Harrington and Deininger constructed a canvas tunnel to separate the space from the front door to the fireplace from the remainder of the living room. (On the occasion of the Court’s view of the premises, the canvas tunnel was in place.)
In February 2007, what was referred by the parties as a “near fire” broke out in the furnace, causing smoke and soot to permeate the hallways of the Condominium. Peter Dickey (“Dickey”), the principal of Boston’s Best, was summoned, and the furnace was shut down. Dickey advised the trustees at the time (and confirmed at trial) that the simultaneous use of the flue by the furnace and 1A Fireplace posed a serious danger to the Condominium as a whole.
In a February 26, 2007 email to the trustees, Lampert summarized a meeting that he had with Dickey, along with Deininger and several trustees:
“The chimney man [Dickey] explained that we have four problems, in ascending order of altitude”: (1) the exhaust pipe from the furnace is not compliant with code, (2) its point of entry at the base of the chimney is too small, (3) the twisting passage of the chimney up from the point of entry of the furnace pipe had become obstructed and the steel plates there corroded (“the chimney man worked for several hours, removing approximately 24 gallons of oily, wet debris that had accumulated and narrowed the passage”; it “is a temporary solution”; “[t]he base of the chimney from the basement to the height of Curt’s [Deininger’s] apartment must be rebuilt”), and (4) “the flue running from the height of Curt’s apartment to the top of the chimney must be lined.” “As I understood, the foregoing really are not options.” “The chimney man said that his next step would be to take a day or day and a half to do a full inspection to see what would need to be done precisely in the space between Curt’s fireplace and the base of the chimney. That would involve removing the brick from the back of Curt’s fireplace, but not removing the mantle or the area to the side of the fireplace.”
Exhibit 86.
In the same February 26, 2007 email, Lampert noted that after the meeting Deininger and several of the trustees talked. He reported that “Curt refused to allow the chimney man access [for the inspection], although [Deininger] allowed that he might if his marble mantel first were removed by a professional of Curt’s choosing, stored for the duration of the work, and replaced, all with Curt’s oversight, for which [Deininger] would be paid.” Lampert added: “With regard to Curt’s concerns, I am not wholly unsympathetic, but I do not believe that they rationally rise to the level that he has indicated. [Curt] did say that a friend of his had a poor experience with the chimney company; it is quite possible that there are real concerns there, but without more information on that experience, and having seen what struck me as a competent presentation and an impressive client list, I wonder how much may be chalked up to [Curt’s] idiosyncratic concerns.” Id.[2]
Relations between Deininger and the trustees thereafter declined rapidly. He took strong issue with the choice of Boston’s Best as the inspection contractor. Deininger also complained about his and Harrington’s not having been timely provided a copy of the SED report, and when he eventually received it, Deininger accused Porter of having “cunningly concealed” it. On April 3rd, Deininger wrote to Porter: “Have you read the report? Have the trustees read the report? In case nobody has read the report, I will quote from a pertinent section, ‘The existing chimney can only be used to vent the fireplaces that are currently attached to the system requiring another route for the proper venting of the boiler.’ ” Exhibit. 79.
In an apparent response to the strength of Deininger’s concerns, in a May 4,2007 email, Lampert stated to the trustees that Boston’s Best “will review all alternatives as part of its study. [However,] the exigency of the situation requires immediate commencement of the study.” Exhibit. 20.
In an April 30th communication with the other trustees, trustee Georgia Murray (“Murray”) offered to do further check-outs of Boston’s Best, but, as to the confrontational posture adopted by Deininger, she concluded, “[Finally, Curt just does not have the right to deny a contractor of the building’s choice to his unit, period. If we review references, and think it is a good plan, [Curt] simply has to go along.” Exhibit 71.
Thereafter, Lampert and Murray checked out Boston’s Best’s further references, and all were favorable. In an email of May 9,2008, Murray then opined to the trustees:
I think we should get very specific about time frames with Curt, since he has developed a habit of stonewalling, or at least ignoring, and we really should stress time is of the essence if we are going to be able *533 to fix this thing before the heating season ... I also think we have to really frame the discussion about Curt’s involvement. It seems to me that he sometimes thinks he has veto power, and we have to be clear that as a resident he can have input, but it is the responsibility of the trustees to get things done.
Exhibit 74.
In the meantime, Lampert had a one-on-one meeting with Deininger on a park bench in the Boston Common. At the trial, Deininger testified as to the meeting that “when [Lampert] came with a yellow legal pad, I knew I was not dealing with a neighbor.” He viewed Lampert’s agreement to meet as “an exercise” and “not a compassionate common cause.”
In a lengthy letter to Deininger on May 17, 2007 in the wake of the meeting, Lampert expressed gratitude for having met with him and said that he was “writing to update you on the project’s status.” Lampert described the recent reference checks which he and Murray had done and that Boston’s Best’s “reputation is excellent. Every person with whom we spoke—from individual home owners to condominium owners to Boston University’s facility’s management department—has found Boston’s Best Chimney to be efficient, highly knowledgeable, courteous, and neat and respectful when working in living areas.” As to the purpose of the forthcoming inspection of the 1A fireplace, Lampert stated: “The primary goal of the overall project is to guarantee the safety of the furnace’s venting. Other considerations include preservation of the functionality of the existing fireplaces, permanence of the solution, and cost. In light of the primary, goal and the other considerations, Boston’s Best Chimney will consider and present to the Trustees the available solutions. As you know, one solution is to run a liner though the building’s southeast chimney, following the course currently taken by furnace exhaust. The Trustees have instructed Brooks [Porter] to instruct Boston’s Best Chimney to consider that solution and others. The Trustees look forward to discussing Boston’s Best Chimney’s report with you after we receive it.” Exhibit. 83.
Deininger responded to Lampert on May 26th by quoting the excerpt the SED report that he had in his April 3rd letter to Porter. (See above.) He then flatly stated: That’s the code, that’s the law and very explicit in its wording. Finally, I deeply resent the premeditated deception to egregiously steal our fireplace.” Exhibit 81.
At this juncture, Harrington and Deininger engaged counsel. On May 30th their counsel informed the Condominium’s attorney (as memorialized in a letter of July 27, 2007) that “sealing of the fireplaces off to the chimney would be neither acceptable to my clients nor necessary.” Exhibit 6.[3]
During the same period, the trustees consulted with Reinhard Maier (“Maier”), a One Chestnut unit owner, who was also a licensed professional engineer with a specialty in commercial boiler installation and operation.[4] Maier reviewed the reports that had been generated to date and wrote to Lampert and another trustee on June 17, 2007 that carbon monoxide emissions backing up into the premises from an open fireplace vent “can cause potentially deadly harm.” He also noted the risk of explosion from “unburned hydrocarbons” in the chimney and noted his personal experience of having investigated a similar explosion. “[T]he force of the explosion can be tremendous. Unit 1A would be in immediate and potentially deadly danger.” Maier concluded: “Bottom line: The consultant the trust hired is correct. As a minimum the fireplace dampers need be seal[ed] off.” Exhibit 27.
In an effort to avoid a further confrontation with Deininger and Harrington, the trustees again asked Dickey, the principal of Boston’s Best, to consider alternatives other than the lining of the 1A flue. The main alternative that Dickey identified was to run the exhaust pipe of the furnace across the basement and to vent it in a chimney that served a unit of the Condominium, referred to as the “Maisonette,” located in a small courtyard on the northerly side of the building. Trustee Murray and her husband lived there in 2007.[5] While technically feasible, Dickey advised that the Maisonette alternative would require the loss of the use of the fireplace in that unit due to the double venting prohibition of the building code.
Murray thereafter recused herself from the trustees’ evaluation of the alternative, but when the Maisonette option first surfaced, she wrote to her fellow trustees: “Just to be selfish, I will put my interest first. I recognize it would be odd to say that we have the right to eliminate Curt’s ability to have a fire, but you can’t eliminate mine. But when it drops below about 20 degrees in the winter, you can’t get our house above 60 without a fire or space heater.” Exhibit 39.
Ultimately, Dickey recommended against the Maisonette alternative primarily on account of his concern with the likely impact of its installation on the building’s foundation. In reliance on Dickey’s advice and on their understanding that it would involve considerably greater cost, the trustees decided not to pursue the Maisonette alternative rather than the 1A liner scheme. In doing so, Lampert concluded that it was illogical to take away the use of a code-compliant, frequently used wood burning fireplace in favor of a non-compliant coal fireplace that was rarely, if ever (to his understanding), used. The trustees’ decision was not influenced by the circumstance that Murray owned the Maisonette unit. Exhibits 24 and 35.
Deininger continued to refuse access for Boston’s Best’s further inspection. On October 2,2007, counsel for the Condominium formally notified Deininger’s attorney that continuing to do so would result in the imposition of a $50/day fine. Counsel cited Section 5.15 of the Declaration of Trust (“Right of Access”) and G.L.c. 183A as authority. Exhibit 8. The trustees’ *534 counsel further warned that the trustees would seek a court order to secure access and statutory costs, including a statutory lien on Unit 1A as security. Id.
Neither Harrington, Deininger nor their counsel timely responded. Counsel for the trustees on November 2nd informed them that such fines were imposed effective October 13, 2007. Exhibit 9.
Harrington’s counsel did eventually respond, but for reasons that are unclear oh the record, the trustees did not further pursue fines against Harrington. However, through counsel the trustees did insist that Harrington permit the inspection on either December 3rd or 4th 2007. Exhibit 10. In the same communication, the trustees’ counsel noted that the trustees were “willing to discuss alternatives.”
New counsel for Harrington (a partner of her original counsel) then appeared. In a November 29, 2007 letter he informed the trustees that the December 3rd and 4th dates were inconvenient because his clients had a scheduled “medical procedure.” Counsel reiterated Deininger’s insistence on receiving beforehand a written “scope of work” for the inspection, a commitment of restoration of the Fireplace to its existing condition and proof of insurance for “no less than $100,000.” He urged consideration of “alternative methods” and characterized the inspection as a result of the trustees’ “myopic focus.” Harrington’s counsel threatened to sue the trustees individually if they decided “upon a plan by which they sacrifice Mr. Deininger’s fireplace for the sake of their own.” Exhibit 11.
On December 10th 2007, a second “near fire” occurred, which caused the furnace to be shut down again. Dickey of Boston’s Best was summoned. Upon being provided access to the Harrington apartment, Dickey was alarmed to see that the Fireplace vent was open to the flue and that there were indications of the Fireplace having been recently used. Dickey informed Porter (the building manager) and Deininger that the Fireplace vent had to be plugged. When Deininger refused, Dickey informed him (and Porter, who was present on behalf of the trustees) that he would not allow the Condominium’s furnace to be relit unless the vent was closed because of the danger from carbon monoxide backflow if it remained open.
Deininger then allowed Dickey to brick up the vent, but he insisted that it be temporary. He also agreed only after Porter committed to put in writing the trustee’s promise to consider other permanent alternatives than the lining of the southeast chimney. Exhibit 13. Counsel for the trustees thereafter confirmed Porter’s commitment and invited Deininger to provide to the trustees the engineering reports which Deininger had earlier claimed he had with regard to alternative venting schemes. Id., referencing the text of Exhibit 81.
In January 2008, the trustees decided to hire an engineer who specialized in heating systems to evaluate and advise them and their counsel as to their options. David Elovitz (“Elovitz”) of Energy Economics, Inc. was engaged, and on February 11th he submitted his initial report. It concluded, “(T]he only practical option is to dedicate the existing flue to the boiler and to install a new flue liner, which would not permit the [1A] unit owner . . . the right to use the fireplace.” Exhibit 21. Elovitz testified at trial, and the Court found him qualified in his field and credible in all material respects.
Elovitz’s conclusions were communicated to Deininger. Meanwhile, Deininger had retained an engineer of his own, Bradford Keyes (“Keyes”). Keyes proposed an alternative arrangement whereby the existing oil-fired furnace would be replaced with gas-fired boilers to be vented through the exterior wall in the courtyard adjacent to the Maisonette. So configured, the Harrington Fireplace would have been able lawfully to vent alone via the southeast chimney. Keyes estimated a cost of $38,000, plus $10,000 for a new water heater. Exhibits 31 and 64.
The Keyes proposal was provided to Elovitz for his evaluation, and the trustees thereafter met with both Keyes and Elovitz to discuss the various options.
Maier, who at this juncture had become a trustee and who, as noted, was a licensed engineer, reviewed the Keyes proposal. He had major reservations about it. His primary concern was what he predicted would be the “pluming” effect caused by the exhaust vents in the Maisonette courtyard and the resultant risk of icing in the winter. Maier was further of the opinion that the existing furnace had a substantial useful life remaining, which would be wasted if the furnace were to be replaced.
Elovitz was of the opinion that the replacement with the gas-fired system was feasible, but he did not believe that Keyes’s cost estimate was reasonable and so advised the trustees.
Meanwhile in July 2008, Deininger informed the trustees that the only circumstance whereby he and Harrington would agree to the lining of the chimney and the loss of the use of the Fireplace would be if all other unit owners on the A side of the One Chestnut agreed to have their fireplaces bricked up as well.[6] Exhibit 18.
Despite Elovitz’s and Maier’s reservations about the Keyes proposal, because of Deininger’s continued opposition to the southeast chimney lining project, the trustees decided to solicit requests for proposals from contractors based on the Keyes system. Exhibit 43. Nevertheless, with the 2008-2009 heating approaching, the trustees insisted that the postponed inspection of the 1A Fireplace proceed.[7]
On October 1, 2008 counsel for the trustees forwarded an agreement, which required Harrington’s assent to the lining project. If Harrington did not sign by October 3rd, counsel said that a suit would be filed to enjoin Harrington’s refusal to allow the Condominium’s contractor access to the Fireplace. Exhibit 33. Harrington refused to sign, and this action was filed on November 4, 2008.
*535 On November 26, 2008 Justice Giles of this Court allowed the trustees’ motion for a preliminary injunction to permit the inspection of unit 1A and the installation of the flue liner in the chimney. Paper #10. Harrington’s appeal to the Appeals Court was unsuccessful.
The Trustees paid $26,628.92 in legal fees and costs to obtain the preliminary injunction and to defend the injunction on appeal. Exhibit 47. Such fees and expenses were reasonable and necessary for the protection of the Condominium’s material interests.
Notwithstanding the trustees having secured the preliminary injunction authorizing the lining project, they did not follow through with it at the time. Among the reasons for not having done so was that Dickey of Boston’s Best refused to be further involved in the project because he was afraid that he would be sued by Harrington and Deininger. There is no evidence that Harrington and Deininger in fact threatened to do so, but the Court finds that, in light of the history of the dispute and Deininger’s conduct as recounted above, Dickey’s concern for the prospect of litigation was reasonable. The trustees attempted to engage a new contractor for the inspection and the flue liner project in 2009, but they were unable to obtain a satisfactory proposal. Exhibits 37, 38, 41, 69 and 72. And at least one additional contractor, Atlantic Chimney, withdrew purportedly because of the risk of being sued.
Despite the injunction, the trustees also continued to consider the Keyes proposal as an alternative to the 1A liner project. As noted, they decided to solicit RFPs in 2008. In 2010 they retained the consulting firm of Boston Environmental Engineering Associates, Inc. (“Boston Environmental”) to review the responses that were received in response to the RFPs and to advise on the feasibility of the Keyes proposal. In a report dated January 11,2011, signed by Gene Marckini, PE, Boston Environmental stated that only two of the five vendors to whom the Keyes proposal was forwarded responded. Their cost estimates were $102,495 and $107,895. (This contrasted with Keyes’s estimate, as noted above, of $48,000.) Marckini concluded the report in these terms: “It is my professional opinion that [the Keyes] project could be successfully accomplished, but there are many potential pitfalls and problems to overcome along the way and tuning the system to assure fault free operation could be difficult and time consuming . . . Therefore, I would propose this installation only as a last resort.” Exhibit 44.
As of the time of trial, the furnace continued to vent through the southeast chimney, Harrington’s Fireplace flue was temporarily bricked up, and the chimney flue liner remained uninstalled pending the Court’s decision.
The Court finds that the trustees, individually and collectively, at all times acted in good faith in what they believed to be the best interest of the Condominium. The Court further finds that the trustees, individually and collectively, fairly and objectively evaluated the options to address the issues posed by the deteriorated condition of the southeast chimney and the circumstance of the furnace and 1A Fireplace illegally venting through the common flue.
The Court finds that while Harrington and Deinin-ger were sincere in their concern to preserve the use of the Fireplace and to avoid damage to their furnishings and objets d’art, their conduct to obstruct the timely inspection of the flue and to prevent the project from proceeding was unreasonable. As a result, they placed the security of the Condominium and the safety of its unit owners at risk.
As to the economic value of the Harrington Fireplace as an operating unit, the Court finds that the loss of its use would only nominally affect lA’s fair market value. That was the opinion of the trustees’ appraiser, Mark Reenstiema (“Reenstiema”), who testified that the loss of value would be “less than a couple of thousand dollars. ” The Court found Reenstiema to be well qualified and credible. Conversely, Harrington’s expert’s opinion that the loss of the use of the Fireplace would diminish Unit lA’s value by $75,000 was unpersuasive and the result of a highly subjective methodology that was ungrounded in objective sales-based data.
Section 4(c) of the Condominium’s Master Deed (the “Master Deed”) provides that “no structural components of the Building, and no pipes, wires, conduits, ducts, flues or public utility lines situated within a Unit and forming part of any systems serving one or more other Units or the Common Elements, shall be deemed to be part of said Unit.” Exhibit 1.
Section 5 of the Master Deed, titled, “Common Elements,” provides that “flues” are common elements. Id.
Section 6 of the Master Deed, titled, “Pipes, Wires, Flues, Ducts, Cables, Conduits, Public Lines and other Common Elements Located Inside of Units; Trustees’ Right of Access,” provides:
Each Unit Owner shall have an easement in common with the owners of all other Units to use all pipes! wires, ducts, flues, cables, conduits, public utility lines and other Common Elements located in any of the other Units or elsewhere in the Condominium and serving his Unit. Each Unit shall be subject to an easement in favor of the owners of all other Units to use the pipes, wires, ducts, flues, cables, conduits, public utility lines and other Common elements located in such Unit and serving other Units. The Trustees and their authorized agents and employees shall have a right of access (at reasonable times and upon reasonable notice except in emergencies) to each Unit to inspect the same, to remove violations therefrom and to maintain, repair or replace the Common Elements contained therein or elsewhere in the Building.

Id.

Section 5.9(b) of the One Chestnut Condominium Trust (the “Condominium Trust”) provides, “All main *536 tenance, repairs and replacements to the Common Elements” shall be done by the Trustees and shall be charged to all the Unit Owners as a Common Expense . . ." Exhibit 2.
Section 5.15 of the Condominium Trust further provides, “A Unit Owner shall grant a right of access to his Unit, at reasonable times and upon reasonable notice, except in emergencies, to the manager, the managing agent and any other person authorized by the Trustees, the manager or the managing agent, for the purpose of making inspections or for the purpose of correcting any conditions originating in his Unit and threatening another Unit or a Common Element, or for the purpose of performing installations, alterations or repairs to the mechanical or electrical services or other Common Elements in his Unit or Elsewhere in the Building ...” Id.
The furnace, the southeast chimney, the flues within the chimney and the various connections between them are common elements of the Condominium.
Harrington and Deininger were aware of the above provisions of the Master Deed and the Condominium Trust.
Rulings of Law
The SJC has defined the nature of ownership interests in a condominium in the following terms:
Ownership of a residential condominium involves a form of property ownership different from ownership of a house. Ownership of a condominium unit is a hybrid form of interest in real estate, entitling the owner to both exclusive ownership and possession of his unit, G.L.c. 183A, §4, and ... an undivided interest [as tenant in common together with all the other unit owners] in the common areas ... This division between individual and common rights is basic to the theory of condominium ownership. It affords an opportunity to combine the legal benefits of fee simple ownership with the economic advantages of joint acquisition and operation of various amenities including recreational facilities, contracted caretaking, and security safeguards. In keeping with this division of property ownership, condominium unit owners cede the management and control of the common areas to the organization of unit owners, which is the only party that may bring litigation relating to the common areas of the condominium development on their behalf. G.L.c. 183A, §10 (b)(4).
Berish v. Bornstein, 437 Mass. 252, 262-63 (2002) (quotations and citations omitted).
The Master Deed is the founding document of the One Chestnut Condominium and is the source of the authority (and limitation of the authority) of the trustees to act. Queler v. Skowron, 438 Mass. 304, 311 (2002). It is well established that “(d]eeds should be ‘construed as to give effect to the intent of the parties, unless inconsistent with some law or repugnant to the terms of the grant.’ The intent of the parties is gleaned from ‘the words used, interpreted in the light of the material circumstances and pertinent facts known to them at the time [the deed] was executed.’ ” Id. (citations omitted).
The trustees have a fiduciary duty to the condominium as a whole, but not to individual unit owners. See Cigal v. Leader Dev. Corp., 408 Mass. 212, 219 (1990), and Glickman v. Brown, 21 Mass.App.Ct. 236 (1985) (trustees act only for the benefit of all the unit owners). The trustees’ authority vis-a-vis individual unit owners is not unlimited, however. They must avoid interfering unreasonably with an owner’s use and enjoyment of his property such as to comprise a nuisance. McEneaney v. Chestnut Hill Realty Corp., 38 Mass.App.Ct. 573, 578 (1995). And generally, use restrictions imposed by trustees are subject to review for “equitable reasonableness,” i.e., “that [they] are reasonably related to the promotion of the health, happiness and peace of mind of the unit owners.” Noble v. Murphy, 34 Mass.App.Ct. 452, 457 (1993).
Harrington posits that she has an affirmative property right to the use of the southeast chimney flue for purposes of venting the Fireplace because the Master Deed grants a formal easement to use the flue which services the Fireplace. Citing the SJC’s decision in Zoning Bd. of Appeals of Groton v. Housing App. Comm., 451 Mass. 35, 40 (2008), for the proposition that the grant of the easement created an interest in property and that the size of the easement “does not change its legal significance as the conveyance of a property interest or right that places a burden on the property and possessory rights of the landowner,” Harrington argues that the Condominium is the servient estate. As such, Harrington submits that the Condominium’s trustees are “obligate[d] . . . not to interfere with the uses authorized by the easement.” Patterson v. Paul, 448 Mass. 658, 663 (2007). In bottom line terms, Harrington states that the trustees have no authority to restrict the access of her Fireplace to the flue.
The fundamental flaw in Harrington’s argument is that the text of the Master Deed (the substantive primacy of which she stresses) does not refer to or create a conventional common-law “easement.” Rather, the text of Section 6 provides for “an easement in common with the owners of all other Units” in the flue (emphasis added). Given the “hybrid” nature of Harrington’s ownership interest thus created, the common law of easements is not applicable. Busalacchi v. McCabe, 71 Mass.App.Ct. 493, 499 (2008). Because Harrington owns an interest in common with the other unit owners, there are no dominant and servient estates, i.e., Harrington cannot have an easement in her own tenancy in common. See Levy v. Reardon, 43 Mass.App.Ct. 431, 437 (1997), overruled on other grounds, Queler v. Skowron, supra, 438 Mass. at 316.[8]
With Harrington without a common-law easement, the question then becomes whether the trustees’ conduct and the permanent relief they seek comprise a reasonable restriction on her use of the Condominium’s common elements. Noble v. Murphy, supra, at 457.
*537 G.L.c. 183A, §11 (e) permits restrictions on use of residential units which are designed to prevent unreasonable interference by individual unit owners with the other owners’ use of the common areas. Id. at 456. To have permitted Harrington to continue to use the Fireplace while the Condominium’s furnace was vented via the same flue would have jeopardized the health and safety of all owners of One Chestnut—and most immediately Harrington and Deininger themselves. To require that the trustees reconfigure the entire heating system of One Chestnut to vent independently of the southeast chimney as provided in the Keyes proposal at more than three times the cost of the flue liner project would be manifestly unreasonable. Harrington’s use of the Fireplace was episodic, at most, and conversion of the Fireplace to permanent ornamental status would cause a negligible loss of market value to the apartment.
Moreover, the trustees’ conduct in responding to Harrington’s and Deininger’s concerns was measured, considerate and objective—under trying circumstances. From the outset, Lampert, the chair of the trustees, sought alternatives that would preserve Harrington’s functioning Fireplace within reasonable cost parameters for the Condominium’s remaining owners. Even after the trustees obtained the preliminary injunction, they engaged a consultant to evaluate responses of contractors to requests for proposals based on the Keyes gas-fired heating system that would vent through the courtyard. As noted, those responses led the consultant to conclude that the Keyes proposal had “many potential pitfalls and problems” and that he would recommend it “only as a last resort.”
The SJC and the Appeals Court have emphasized repeatedly the public policy interest of providing condominium trustees a wide scope of discretion within the purview of their lawful duties as the only reasonable means of ensuring the viable administration of the condominium form of ownership. See Trustees of Prince Condominium Trust v. Prosser, 412 Mass. 723, 726-27 (1992) (“A system that would tolerate a unit owner’s refusal to pay an assessment because the unit owner asserts a grievance, even a seemingly meritorious one, would threaten the financial integrify of the entire condominium operation”).[9] See also Baker v. Monga, 32 Mass.App.Ct. 450, 453-54 (1992) (holding that“(ajbsent an adjudication by a court of competent jurisdiction ... condominium charges by the unit owners’ organization are not subject to set-off or some other form of self-help remedy” (emphasis added), and Blood v. Edgar's, Inc., 36 Mass.App.Ct. 402, 405, 410 (1994) (“[A] condominium unit owner may not challenge the legality of a common expense assessment by refusing to pay it”).
Accordingly, trustee Georgia Murray was correct as a matter of law when she communicated to her fellow trustees in April 2007 that “Curt [Deininger] just does not have the right to deny a contractor of the [Condominium trustees’] choice to his unit—period.” She was similarly on point when she noted that “we have to be clear that as a resident [Curt] can have input, but it is the responsibility of the trustees to get things done.”
The facts of this case vividly illustrate the mischief that a presumably well meaning but idiosyncratic unit owner can cause to a condominium. Almost five years have passed since the acute problem with the condition of the southeast chimney at One Chestnut was identified. Temporary measures have been taken that address the greatest risk posed by the shared flue, but a permanent solution has been held hostage to Harrington’s obstructive refusal to cooperate with the trustees and the chilling effect which that conduct has had on the willingness of contractors to become involved for fear of being swept into court.
The Court’s judgment in favor of the trustees is compelled because Harrington's and Deininger’s conduct placed at risk “the viability of the [One Chestnut] condominium enterprise.” Prince, 412 Mass. at 726, n.3.
Harrington’s counterclaim fails. As noted earlier, a unit owner does not have standing to bring a breach of fiduciary duty claim against the trustees because the trustees’ duty in that respect runs exclusively to the Condominium. Cigal v. Leader Dev. Corp., supra at 219. The trustees have not been unjustly enriched because Harrington has not conferred a benefit of substance upon them, the retention of which would be inequitable. Keller v. O’Brien, 425 Mass. 774, 778 (1997). See also Santagate v. Tower, 64 Mass.App.Ct. 324, 329 (2005). Further, unjust enrichment does not lie where a party has an adequate remedy at law. Popponesset Beach Ass’n v. Marchillo, 39 Mass.App.Ct. 586, 593 (1996). And with Harrington not having identified any other cause of action that would entitle her to relief, a claim for declaratory judgment cannot be asserted as was done in Count 3 of her counterclaim. G.L.c. 321A, §1. Second Church in Dorchester v. Boston, 343 Mass. 477, 479 (1962).
Pursuant to G.L.c. 183A, §10(b)(5), the Trustees have the right to “levy reasonable fines for violations of the master deed, trust, by-laws, restrictions, rules or regulations of the organization of unit owners.” Further, the Trustees have a statutory lien against the Unit for the unpaid fines, as well as the costs of collection and enforcement of said fines, including attorneys fees. G.L.c. 183A, §6(a)(ii), provides in pertinent part:
The organization of unit owners may... assess any fees, attorneys fees, charges, late charges, fines, costs of collection and enforcement, court costs, and interest charged pursuant to this chapter against the unit owner and such assessment shall constitute a lien against the unit from the time the assessment is due, and shall be enforceable as, common expense assessments under this chapter.
Section 11 of the Master Deed provides that all unit owners are subject to the provisions of their unit deeds, the Master Deed, Declaration of Trust and Rules and *538 Regulations and that “all of such provisions shall be deemed and taken to be covenants running with the land and shall bind any person having at any time any interest or estate in such Unit ...” Exhibit 1.
ORDER
Judgment shall enter for the Trustees on all counts of the complaint and counterclaim, together with their reasonable and necessary legal fees and expenses incurred to the date of the entry of this order. Such fees and expenses are to include but not be limited to the $26,628.92 incurred through the preliminary injunction stage of the litigation and related appeal.
Within 14 days of the entry of this order, counsel for the Trustees shall submit to the Court an affidavit as to all reasonable and necessary legal fees and expenses that have been incurred in connection with the instant action following the entry of the preliminary injunction and the related appeal.
Within 14 days of the filing of such affidavit, the defendant may file an opposition to such application for fees and expenses.
Such legal fees and expenses of the Trustees shall constitute a lien on Unit 1A of the Condominium pursuant to G.L.c. 183A, §6, with the priority set forth in G.L.c. 183A, §6 and may be enforced according to the provisions of G.L.c. 254, §§5 and 5A.
The defendant Mina Harrington and Curt Deininger and their respective agents, servants and employees are enj oined and restrained from failing to allow the Trustees of One Chestnut Condominium Trust and their agents access to Unit 1A of the One Chestnut Condominium, One Chestnut Street, Boston MA for the purpose of installing, maintaining, repairing and replacing a steel liner in the common area flue of the One Chestnut Condominium at a time or times which meet the Schedule of the Trustees and their agents, with such notice as the Trustees deem reasonable in good faith on each occasion. There shall be no time limitation on the foregoing order, and the Trustees shall have a right of access to Unit 1A at any time hereafter for the foregoing purpose and with such notice as the Trustees deem reasonable in good faith on each such occasion.
The defendant Mina Harrington and Curt Deininger and their respective agents, servants and employees are enjoined and restrained from contacting, communicating with and/or directly or indirectly threatening with legal action any contractors retained by the Trustees for the purpose of installing, maintaining, repairing and replacing a steel liner in the common area flue of the One Chestnut Condominium, except for good cause and exclusively effectuated through counsel and with prior approval of the Court.
The undersigned justice retains jurisdiction of any matters relating to this order until further order of the Court.

deininger was replaced by a professional property management firm in the mid-90s in the wake of some apparent unpleasantness after Deininger unsuccessfully opposed a One Chestnut unit owner’s proposal to combine two units into a single larger apartment.

In a later communication in 2007, Deininger formally laid out the conditions of allowing access for Boston’s Best further inspection: That it be a one-time inspection, that the scope of work be formally described in a “job description,” that Harrington be named as “loss payee” on a $150,000 insurance policy and that he be financially compensated for his “work/time loss.” Exhibit 45.

Counsel’s July 27th letter also described that in the recent inspection by the trustees and the contractor of the Fireplace, “it took [Harrington and Deininger] 33 hours to remove carpets from the floor, remove paintings, move furniture, move books, and build a canvas tunnel from the front door entrance to the fireplace ... It took approximately the same time to return the contents as before. While we wish to be cooperative, it is extremely burdensome to have to endure another visit. Since the use of the same flue from the furnace and a fireplace is prohibited by code, why is it necessary to examine the fireplace again?” Id.

In 2008 Maier was elected a trustee of the Condominium.

The unit was subsequently sold to Lampert, who moved there from his other unit in the building. Lampert presently resides in the Maisonette.

The fireplaces of other A side owners vented through different flues than the flue shared by 1A and the furnace. Accordingly, there was no code compliance issue with their operation.

In March 2008 Deininger’s and Harrington’s counsel had reaffirmed their reluctance to permit the inspection and added a further requirement by stating that “[w]e would also like to ensure that Boston’s Best has the appropriate tools to perform whatever measuring that it needs to perform so that the intrusions into Unit 1A will finally stop.” Ex. 16.

Section 4(c) of the Master Deed further provides that “no structural components of the Building, and no pipes, wires, conduits, ducts, flues or public utility lines situated within a Unit and forming part of any systems serving one or more other Units or the Common Elements, shall be deemed to be part of said Unit.”

The facts of the Prosser case are particularly instructive for the case at hand. There, a unit owner had a deeded parking space conveyed by the condominium’s original developer. The Boston Fire Department cited the trustees with a violation of the fire code on account of the location of the space. In compliance with the citation, the trustees barred further use of the parking space. The unit owner then sued the trustees. The SJC found for the trustees:
Prosser argues that the condominium trustees unlawfully took his parking space without compensating him for his loss. The problem with this argument is that the condominium trustees did not cause Prosser’s loss. It may be that the condominium developer purported to sell Prosser a space for parking that lawfully could not be used for that purpose. In any event, the Boston fire department issued the order that the space not be used for parking. The trustees simply carried out that order. Although Prosser paid for a parking space that he now cannot lawfully use, the condominium trustees are not responsible for any wrong the developer committed or for the consequences of an order of the Boston fire department. The trustees have not violated their obligations as trustees. They had no duty to provide Prosser with an alternative parking space.
Id. at 727.